**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| ANGELA DUSKO, on behalf of herself and all others similarly situated, | Case No. _____ |
| *Plaintiff,* | **COMPLAINT – CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| DELTA AIR LINES, INC., | |
| *Defendant.* | |

**COMPLAINT – CLASS ACTION**

Plaintiff Angela Dusko ("Ms. Dusko" or "Plaintiff"), on behalf of herself and all others similarly situated, by and through undersigned counsel, files this Class Action Complaint against Defendant Delta Air Lines, Inc., ("Delta" or "Defendant"), and alleges the following:

**INTRODUCTION AND FACTUAL BACKGROUND**

1.     Delta is one of the world's largest airlines. In 2019, it was the largest passenger air carrier in the world based on total revenue.

1

2.     Delta typically operates over 5,400 daily flights and serves 325 destinations in over fifty countries. But this year, Delta has responded to a sudden drop in demand for passenger air travel by canceling scores of scheduled flights.

3.     Under the terms of Delta's uniform contracts with its customers, when the airline cancels a flight, the airline must either re-accommodate passengers on the next available flight or refund the passengers. Delta has breached its contracts with thousands of paying customers by offering credits for future travel on the airline instead of providing refunds for flights canceled by the airline.

**Declining Demand in Light of Novel
Coronavirus Severely Impacts Delta's Operation**

4.     On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or SARS-CoV-2. The illness caused by the virus has been termed COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic cases of COVID-19.

5.     Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public

health emergency of international concern."

6.     On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

7.     In efforts to curb the spread of the virus, federal, state and local governments have implemented temporary travel restrictions and guidelines advising against essential travel. In the United States, the federal government has limited travel from China, Europe, and the United Kingdom, permitting only the return of U.S. citizens and permanent residents. The Department of State also advised on March 19, 2020, that U.S. citizens should temporarily avoid all international travel—including to Mexico, one of the most popular international destinations for American tourists—with the exception that U.S. residents abroad should arrange for immediate return to the United States where possible.

8.     State and local governments have also restricted local travel. On March 16, 2020, seven counties in the San Francisco, California area announced shelter-in-place orders to reduce local traffic to activities necessary to perform "essential" activities. Other states, counties, and municipalities have since implemented similar shelter-in-place orders, and as of the drafting of this Class Action Complaint, at least 316 million people in at least 42 states, three counties, nine cities, the District of Columbia, and Puerto Rico are living under such orders or advisories.

9.      In addition to health and safety concerns, people across the country are facing increasing economic stress due to the novel coronavirus, including unemployment levels not seen since the Great Depression.

10.     As the travel limitations, virus fears, and economic uncertainties mounted, consumer demand for air travel, particularly leisure and non-essential business travel, quickly declined. In response to this declining demand, Delta has canceled many flights to avoid flying planes with too many empty seats to be profitable.

11.     The main way that airlines like Delta determine operational capacity (*i.e.*, how many flights it markets and flies) is by looking at passenger "load factors" on each route. Load factors measure the percentage of seats filled by paying passengers on an aircraft (or a set of aircraft) scheduled to depart.[1] Load factors can be determined for an overall schedule (all flights to all destinations), for particular routes (all flights between two airports), or for particular flight service (a specific scheduled flight with its own flight number). If load factors fall too low, airlines will determine that operating flight service as scheduled would not be profitable (or otherwise economically desirable) and will then typically modify the schedule—

---

[1] *See Load Factor*, DELTA NEWS HUB (last visited April 16, 2020), https://news.delta.com/load-factor.

including by canceling previously scheduled flights.

12.     Delta's overall load factor is typically around 85 to 86%. But with declining customer demand in light of COVID-19, the airline has seen significant drops in its load factors. It has canceled thousands of flights in response.

13.     On March 13, 2020, for example, Delta announced to its crewmembers that it would reduce spending and costs given the rapidly declining demand for air travel.[2] A major component of Delta's plan to reduce spending was to cut at least 40% of scheduled flights for several months, including nearly all scheduled flights to Europe.[3]

14.     On March 18, 2020, Delta's CEO, Ed Bastian, wrote an update to crewmembers and the public regarding steps the airline was taking in light of COVID-19.[4] Mr. Bastian highlighted that because "demand for travel has dropped significantly," Delta was cutting scheduled flights by 70% "until demand starts to recover."[5]

---

[2] *CEO Ed Bastian: Delta takes further steps to protect our customers, employees and business*, DELTA NEWS HUB (Mar. 13, 2020), https://news.delta.com/ceo-ed-bastian-delta-takes-further-steps-protect-our-customers-employees-and-business.
[3] *Id.*
[4] Ed Bastian, *Ed Bastian memo: Delta taking additional steps to protect future*, DELTA NEWS HUB (Mar. 18, 2020), https://news.delta.com/ed-bastian-memo-delta-taking-additional-steps-protect-our-future.
[5] *Id.*

15.   By April 14, 2020, Delta had made further flight cuts, reducing its service by 80%.[6]

16.   Delta needs to carefully plan flight routes and schedules to ensure that aircraft are available for scheduled departures from various airports within the airline's large network. Large scale cancellations, such as those made by Delta in light of declining demand related to COVID-19, must therefore be carefully planned well in advance of the scheduled flights.

17.   Despite its self-imposed obligations to notify passengers of cancellations and other flight schedule changes within 30 minutes of becoming aware of such changes,[7] Delta has been withholding cancellation notifications from customers for weeks after canceling the customers' flights. Delta is often waiting until a day or two before a canceled flight to notify customers that the airline has canceled the flight.

### Delta Offers Customers Credit Where Refunds Are Due

18.   When Delta cancels a flight, its uniform contracts with its passengers require the airline to either (1) rebook passengers on the next available flight to their

---

[6] Ed Bastian, *Ed Bastian memo: Protecting our future*, DELTA NEWS HUB (April 14, 2020), https://news.delta.com/ed-bastian-memo-protecting-our-future.

[7] *See* Delta Air Lines, *Customer Commitment*, § 2 (last updated April 17, 2020), https://www.delta.com/us/en/legal/customer-commitment.

destination; or (2) provide a full refund. The contract terms governing cancellations by the airline do not give Delta the option of providing customers with a "credit" for future travel on the airline instead of a refund.

19.    Nevertheless, after canceling as many as 80% of its scheduled flights, Delta has offered many of its canceled passengers only two options: (1) rebook your flight to a route that the airline has not canceled, or (2) obtain travel credit.

20.    Contrary to the terms of its contracts with its passengers, Delta's online Coronavirus Travel FAQs state: "In keeping with our longstanding policy, if Delta cancels or significantly delays a flight, you will first be rebooked on an alternate flight. If you choose to cancel your reservation, or if Delta cannot find an alternate flight and cancels the reservation for you, **you will be issued an eCredit** for the value of the ticket, which can be used toward future travel through May 31, 2022."[8] This announced policy is contrary to its contractual obligations, which require the airline to simply offer either (i) rebooking on the next available flight or (ii) a refund. Delta's contracts with its passengers make no mention of the possibility of a Delta credit for future travel, and such an offer is inconsistent with the promises Delta made to its

---

[8] Delta Air Lines, "Can I request a refund if my flight has been canceled or significantly delayed?", CORONAVIRUS TRAVEL UPDATES (last visited April 16, 2020), https://www.delta.com/us/en/advisories/coronavirus-travel/overview, (emphasis added).

customers.

21.     Despite Delta's suggestions in its public press releases and on its website that it is "[t]aking care of customers" by providing extended credits for canceled flights,[9] it is actually breaching its contracts with its customers who are entitled to refunds. Instead of following the terms of its contracts, Delta is unilaterally pushing eCredits on customers, making it impossible for many customers to request refunds, and denying refunds when legitimate requests are made.

22.     While Delta is focused on taking any and all "self-help measures" it can to preserve its own cashflow,[10] customers who are owed refunds after the airline failed to transport them to their destinations are suffering financially.

23.     Delta is placing its concern for its own financial stability ahead of the significant economic impacts its consumers are facing in this unprecedented economic downturn. In just over one month, over 22 million people in the United

---

[9] *Flexibility in times of change: Delta extends ability to rebook coronavirus-impacted travel for up to 2 years*, Delta News Hub (April 3, 2020), https://news.delta.com/flexibility-times-change-delta-extends-ability-rebook-coronavirus-impacted-travel-2-years; Ed Bastian, *Ed Bastian memo: Protecting our future*, DELTA NEWS HUB (April 14, 2020), https://news.delta.com/ed-bastian-memo-protecting-our-future.

[10] Ed Bastian, *Ed Bastian memo: Delta taking additional steps to protect future*, DELTA NEWS HUB (Mar. 18, 2020), https://news.delta.com/ed-bastian-memo-delta-taking-additional-steps-protect-our-future.

States have applied for unemployment benefits, and the U.S. unemployment rate has climbed to over 20%—the worst it has been since the Great Depression. As many as one-third of the 40 million renters in the U.S. are unable to make their rent, and millions of people with home mortgages will likely face foreclosure. Meanwhile, Delta is currently slated to receive an influx of $5.4 billion in government rescue funds, in the form of grants and loans that will likely be forgiven.[11] These government bailout funds are tied to the airline's commitment to provide a minimum level of service to airline customers, and yet, Delta is already failing to meet its commitments to existing customers who are owed refunds. Now more than ever, customers whose flights or reservations have been canceled by Delta need the prompt refunds to which they are entitled.

24.    Since March 2020, Delta has made updates to its website to alert customers of its options to cancel and rebook their flights (*i.e.*, highlighting the policies for cancellations by the customer and directing customers to streamlined procedures to make such cancellations). But, despite the thousands of flights canceled *by the airline*, Delta has failed to include in these website updates clear statements of the policies and procedures for cases where the airline has canceled a

---

[11] Ed Bastian, *Ed Bastian memo: Protecting our future*, DELTA NEWS HUB (April 14, 2020), https://news.delta.com/ed-bastian-memo-protecting-our-future.

customer's flight. Delta has similarly failed to highlight and provide ample resources to allow canceled passengers to request or obtain the refunds they are owed under the contracts. And, when customers finally reach a webpage or customer service representative regarding their options, they are met with Delta's misinformation about the refunds to which the customers are entitled.

25.     In addition, even though Delta knows which flights it has decided to cancel days or weeks in advance of scheduled departures—Delta has failed to send prompt cancellation notifications to customers with reservations on the canceled flights.

26.     As numerous customers complained about Delta and other airlines' recent practice of refusing to refund consumers for flights canceled by the airlines, the DOT issued an Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel ("DOT Notice"). The DOT Notice provides that the airlines must refund tickets if they cancel flights due to the novel coronavirus:

> The U.S. Department of Transportation's Office of Aviation Enforcement and Proceedings (Aviation Enforcement Office), a unit within the Office of the General Counsel, is issuing this notice to remind the traveling public, and U.S. and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats, that passengers should be ***refunded promptly*** when their scheduled flights are cancelled or significantly delayed. Airlines have long provided such

10

refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had an unprecedented impact on air travel, ***the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged.***

The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.

Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger. Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change,

or significantly delays a flight to be a violation of the carriers'
obligation that could subject the carrier to an enforcement action.[12]

(emphasis added).

27.    Thus, Delta's failure to provide prompt refunds for canceled flights
violates not only its own contracts, but also federal law.

## PARTIES, JURISDICTION, AND VENUE

28.    Plaintiff Angela Dusko is a Montana Citizen who resides in Lewis and
Clark County, Montana.

29.    Defendant Delta Air Lines, Inc. is a Delaware for-profit corporation
with its principal place of business located at 1030 Delta Blvd., Atlanta, Georgia. It
may be served via its registered agent, Corporate Service Company, whose address
is 40 Technology Parkway South, Suite 300, Norcross, GA 30092, USA.

30.    This Court has subject matter jurisdiction pursuant to the Class Action
Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy
exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than
100 putative class members, and minimal diversity exists because many putative

---

[12] U.S. Dep't of Transportation, Enforcement Notice Regarding Refunds by
Carriers given the Unprecedented Impact of the COVID-19 Public Health
Emergency on Air Travel (Apr. 3, 2020),
https://www.transportation.gov/sites/dot.gov/files/2020-
04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf.

class members are citizens of a different state than Defendant.

31.    Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Delta maintains its principal place of business in this District. Delta operates its largest hub for domestic and international flights at Hartsfield-Jackson International Airport, which is located in this District. In addition, a substantial part of the events giving rise to the claims asserted herein—including Delta's decisions and actions relating to its new refund policy in light of COVID-19—occurred in this District.

## GENERAL ALLEGATIONS

### Delta's Contracts

32.    Delta's Contract of Carriage applies to all tickets "for travel on Delta." One Contract of Carriage applies for international flights, *see* **Delta International Contract of Carriage, attached as Exhibit A,** and another applies for domestic flights within the United States, *see* **Delta Domestic Contract of Carriage, attached as Exhibit B.** Delta drafted both the International and Domestic Contracts of Carriage (together, the "Contracts"). The terms of both Contracts, as relevant here, are materially the same.

33.    In addition to applying to all flights operated by Delta, the Contracts also apply to flights operated by carriers operating under the name Delta Connection or Delta Shuttle, and to codeshare flights where Delta markets the flights of another

carrier pursuant to a codeshare agreement. Ex. A, Rule 1(A); Ex. B, Rule 1(A).

34.   Delta's Contracts provide: "If there is a flight cancellation, diversion, delay of greater than 90 minutes, or that will cause a passenger to miss connections, Delta will (at passenger's request) cancel the remaining ticket and refund the unused portion of the ticket and unused ancillary fees in the original form of payment in accordance with [the Contract's Refunds Rule]. If the passenger does not request cancellation and refund of the remaining portion of the ticket, Delta will transport the passenger to the destination on Delta's next flight on which seats are available in the class of service originally purchased." Ex. A, Rule 20(A), Ex. B, Rule 19(A).

35.   The Refunds Rule—Rule 23(A) of the International Contract and Rule 22(A) of the Domestic Contract—deals with "Involuntary Refunds," and provides:

> If a refund is required because of Delta's failure to operate on schedule or refusal to transport (except as a result of passenger's failure to comply with the contract of carriage), the following refund will be made directly to you:
> 1) If no portion of the ticket has been used, the refund will be an amount equal to the fare paid.
> 2) If a portion of the ticket has been used and termination (interruption) occurs:
>    a) At A Fare Breakpoint - The refund will be an amount equal to the fare paid for the unused transportation from the point of termination (interruption) to the destination or next Stopover point named on the ticket, or to a point at which transportation is to be resumed. . . ."

36.     The Refunds Rule further provides that "Tickets paid by credit card will be refunded to the credit card account used to purchase the ticket, typically within seven business days of Delta's initial receipt of refund request." Ex. A, Rule 23(D)(1); Ex. B, Rule 22(D)(1). The Refunds Rule goes on to describe how tickets purchased by other methods will be refunded. Put simply, a refund, as described in the Contracts, is a refund to the original form of payment (or by check, in the case of a cash payment). Ex. A, Rule 23(D), Ex. B, Rule 22(D).

37.     Delta's Legal Notices section of its website explains that even in cases where a flight delay or cancellation is "due to circumstances beyond [Delta's] control," Delta's liability to the customer under the Contracts is "to refund [the customer's] ticket price."[13]

38.     Despite the clear terms of its Contracts, Delta has failed to provide customers with refunds for flights that the airline canceled and has instead attempted to force customers to accept credits instead of refunds, going so far as to deny explicit refund requests.

39.     Delta is breaching the cancellation and refund provisions of its Contracts on a widespread basis. The current posted policy regarding flight changes

---

[13] Delta Air Lines, Legal Notices – Liability for Delay or Cancellation (last updated Jan. 1, 2020), https://www.delta.com/us/en/legal/notices/overview.

and refunds on Delta's website, for example, makes clear that Delta is failing to adhere to the terms of its Contracts as a policy. Specifically, Delta's customer-facing refunds and cancellations page states: "If there is a flight cancellation or significant delay, you will be rebooked on an alternative flight or your ticket will be converted to an eCredit for future Delta travel.  However, *in some instances*, you may be entitled to request a refund of any unused portion of your non-refundable ticket."[14]

40.     Passengers whose flights have been canceled or significantly delayed (i.e., by more than 90 minutes), are entitled to refunds as a rule under the Contracts— not just "in some instances." Further, none of the applicable terms of Delta's Contracts of Carriage makes any mention of providing the customer an "eCredit" for future travel in cases where Delta cancels a flight or otherwise fails to operate a scheduled flight. Rather, the Contracts clearly provide only for a prompt refund or reaccommodation on the next available flight to the customer's destination. A credit or voucher for future travel on Delta is not a refund under the terms of the Contracts.

## Delta Fails to Refund Ms. Dusko after Canceling Her Flight

41.     On or about December 11, 2019, Plaintiff and her husband purchased four roundtrip tickets for Plaintiff and her family for travel from Helena, Montana,

---

[14] Delta Air Lines, Change or Refund Flight (last visited April 16, 2020), https://www.delta.com/us/en/change-cancel/cancel-flight (emphasis added).

to Cancun, Mexico, on March 27, 2020, and return travel on April 3, 2020. Plaintiff purchased the flights directly from Delta's website and paid cash fares totaling $2783.24, using a joint credit card she shares with her husband.

42.    On March 25, 2020, Plaintiff received an email notification from Delta that her outbound flight to Cancun had been canceled by the airline. The email notification also stated that Delta was currently attempting to rebook Plaintiff and her family on another flight and would notify her again once a rebooking was completed. The email also provided a link to http://www.delta.com/rebook, to allow Plaintiff to take "more immediate action" by selecting her own rebooking option. Neither the flight cancellation email nor the links therein included any mention of Plaintiff's right to a refund under the Contract.

43.    On March 26, 2020, Plaintiff received a second email from Delta that notified her that the airline had rebooked Plaintiff and her family onto a flight scheduled to depart on March 28, 2020— a day after her ticketed departure.

44.    After receiving the cancellation and rebooking notifications, Plaintiff called Delta's customer service hotline to inform Delta that she and her family did not want to be rebooked onto the March 28, 2020 flight and instead would like a full refund for all four round-trip tickets given the airline's cancellation.

45.     Delta's customer service representative denied Ms. Dusko's request for a full refund. Delta customer service instead explained to Plaintiff that, if they chose not to take the rebooked flight on March 28, 2020, Plaintiff and her family were entitled only to flight vouchers for travel on Delta within a 12-month validity period, not a full refund.

46.     In sum, despite the fact that Plaintiff and her family could not take the flight Plaintiff booked because Delta canceled it, Delta failed to provide a refund to Plaintiff and, instead, only offered Plaintiff rebooking or a voucher for use on a future Delta flight.

## CLASS ACTION ALLEGATIONS

47.     Pursuant to N.D. Ga. LR 23.1(A)(2)(a) and (b), Plaintiff brings her claims as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), on behalf of herself and all others similarly situated. and Plaintiff seeks certification of the following nationwide Class:

> All persons in the United States who purchased tickets for travel on a Delta Air Lines, Delta Connection, or Delta Shuttle flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by the airline, and who were not provided a refund. ("Class" or "Proposed Class").

48.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives,

successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered. Also excluded from the Class is any person who was reaccommodated and transported to their ticketed destination by Defendant or its agents on the next available flight and within a reasonable time of the original ticketed departure time.

49.    Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

50.    The Class meet the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

51.    **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose the court order with which they will comply.

52.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. Under N.D.Ga. LR 23.1(A)(2)(b) the Plaintiff states that the exact number of class members is unknown to Plaintiff at this time but may be ascertained through Defendant's records. Based on the large number of flights canceled by Defendant, and the credit-not-refund policies posted on Defendant's websites, the Class likely comprises tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumers' names and addresses are available from Defendant's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

53.     **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, and pursuant to N.D.Ga. L.R. 23.1(A)(2)(d), Plaintiff states that this action involves common questions of law and fact that predominate over any questions affecting individual class members. Delta entered into uniform Contracts of Carriage with customers, and Delta breached those contracts pursuant

to uniform policies applicable to customers whose flights were canceled by the airline. Common questions of law and fact include:

    a.     Whether Defendant's conduct breaches its Contracts of Carriage;

    b.     Whether Defendant is required to give a refund, rather than credit on a future flight when they cancel a flight and cannot reaccommodate the passengers within a reasonable time of the original flight schedule;

    c.     Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

    d.     Whether Plaintiff and members of the Class are entitled to compensatory damages.

54.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and members of the Class were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (*i.e.*, canceling flights without giving refunds in breach of Delta's Contracts of Carriage, as applicable) is the same for all members of the Class.

55.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4) and N.D.Ga. LR 23.1(A)(2)(c), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest

with the Class. Plaintiff's counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

56. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3) and N.D.Ga. LR 23.1(A)(2)(e), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a

single adjudication, economies of scale, and comprehensive supervision by a single court.

57.     **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

58.     Pursuant to N.D.Ga. LR 23.1(A)(2)(f), Plaintiff alleges that, based on Defendant's cancellation of thousands of flights governed by standard contracts and Defendant's enactment and application of uniform policies to only offer credits where refunds are due, the total claims of individual Class Members in this action exceed $5,000,000.00 in the aggregate, exclusive of interest and costs.

## COUNT I - BREACH OF CONTRACT
**(brought by Plaintiff on behalf of herself and the Proposed Class)**

59.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 58 above as if fully set forth herein.

60.     This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Delta's breaches of its

uniform Contracts of Carriage ("Contracts").

61.     Plaintiff, along with all putative class members, entered into a Contract with Delta for the provision of air travel in exchange for payment. These Contracts were drafted by Delta.

62.     Plaintiff, and all putative members of the Class performed under the Contracts, specifically, by tendering payment for tickets on Delta flights or flights marketed by Delta and operated by its codeshare partners, and by complying with all conditions precedent under the Contracts.

63.     Due to Delta's cancellation of their flights, Plaintiff, and all putative class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Delta.

64.     Under the terms of the Contracts of Carriage drafted by Delta, Plaintiff and putative class members are entitled to refunds because Delta canceled their flights and did not reaccommodate the customers on the next available flight. Ex. A, Rule 20(A), Ex. B, Rule 19(A). By failing to provide refunds, Delta has breached its Contracts of Carriage.

65.     Delta has further breached its Contracts of Carriage by attempting to force passengers into accepting travel credits rather than promptly providing refunds for canceled tickets to the original form of payment. Ex. A, Rule 23(D)(1); Ex. B,

Rule 22(D)(1).

66.     As a result of Delta's breaches of contract, Plaintiff and the putative

class members have incurred damages in an amount to be proven at trial.

## COUNT II - BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (brought by Plaintiff on behalf of herself and the Proposed Class)

67.     Plaintiff realleges and reincorporates the allegations in paragraphs 1

through 66 above as if fully set forth herein.

68.     Delta's Contracts with its customers are subject to an implied covenant

of good faith and fair dealing, which is implied in all contracts unless the parties

contract out of the implied covenant by agreeing to other terms that disclaim, waive,

or override the covenant. The parties to the Contracts had the ability to disclaim,

waive, or override the covenant in the contracts, but they did not do so. The parties

thus voluntarily entered into the Contracts, including the covenant of good faith and

fair dealing implied therein.

69.     Plaintiff and members of the Class have performed all conditions,

covenants, and promises required to be performed on their part in accordance with

the terms and conditions of the Contracts.

70.     Under the implied covenant, Delta was obligated to act fairly and in

good faith to perform the terms of the Contracts, including the terms requiring it to

refund passengers whose flights were canceled by the airline and who were not reaccommodated by the airline on the next available flight. Delta was also obligated to interact with canceled passengers in accord with the covenant of good faith and fair dealing, meaning Delta would not do anything to unfairly interfere with the rights of Plaintiff and the Class to receive the benefits of the contract.

71.     Delta's acts described in this Complaint reflect a failure by Delta to perform the promises required by the Contracts in accord with the covenant of good faith and fair dealing. Although Delta has canceled thousands of flights, it has failed to provide the cooperation necessary to allow Plaintiff and members of the Class to perform under the contract's flight cancellation and refund provisions, which provide that Plaintiff and the Class are entitled to refunds if they were not reaccommodated (to their satisfaction) and transported on the next available flight. Instead, Delta has provided Plaintiff and Class members with unfair and inaccurate information regarding their refund options under the Contracts, including by withholding information from class members about known flight cancellations and by insisting that canceled customers are only entitled to vouchers or credits, not refunds.

72.     In failing to perform under its contracts fairly or in good faith, Delta has breached the covenant of good faith and fair dealing.

73.    As a result of Delta's failures to deal fairly or in good faith, Plaintiff and the putative class members have incurred damages in an amount to be proven at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A. For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

B. For herself and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contracts of Carriage;

C. For reasonable attorneys' fees and costs of suit;

D. For pre-judgment interest; and

E. Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 22, 2020

Respectfully submitted,

_/s/Roy E. Barnes_

Roy E. Barnes
Ga. Bar. No. 039000
J. Cameron Tribble
Ga. Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, Georgia 30060
Telephone: (770) 227-6375
Facsimile: (770) 227-6373
Email: roy@barneslawgroup.com
ctribble@barneslawgroup.com

Hassan A. Zavareei*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

V Chai Oliver Prentice*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1000
Oakland, CA 94612
Telephone: (510) 250-3316
Facsimile: (202) 973-0950
Email: vprentice@tzlegal.com

Jeff Ostrow*
Jonathan M. Streisfeld*
Joshua R. Levine*
Daniel Tropin*
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**

1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email:
        streisfeld@kolawyers.com
        ostrow@kolawyers.com
        levine@kolawyers.com

Melissa S. Weiner*
**PEARSON, SIMON &**
**WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email:        mweiner@pswlaw.com

Daniel L. Warshaw*
**PEARSON, SIMON &**
**WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
Email: dwarshaw@pswlaw.com


*pro hac vice application
forthcoming

*Counsel for Plaintiff and the
Proposed Class*